[No. 43789-5-I.    Division One.    December 13, 1999.]

KENNETH WILKES, ET AL., *Appellants*, v. DANIEL O'BRYAN,
ET AL., *Respondents*.

*Andrew Toft Nielsen* of *Nielsen & Nielsen*, for appellants.
*Patrick James Morrissey* of *Morrissey & Sloan*; and *David Earl Duskin*, for respondents.

AGID, A.C.J. — Annette and Thomas Wilkes executed a community property agreement which purported to vest a "fee simple" estate in the surviving spouse, but also provided that upon the death of the second spouse, the residuary estate should be divided among their melded family of six children. Arguing that community property agreements may be used as will substitutes to pass property to third parties, Thomas's three children contend that this agreement created a vested remainder in each of them for one-sixth of the Wilkes' residuary estate. In *Bartlett v. Bartlett*,[1] however, the Washington Supreme Court analyzed a functionally identical community property agreement and held that once a fee simple interest is conveyed, any further attempt in the same instrument to devise a remainder interest is void. Because Thomas's children are unable to demonstrate that *Bartlett* is no longer valid, it is dispositive here, and the trial court properly granted summary judgment against them.

FACTS

Annette and Thomas Wilkes married on September 11, 1971. Each had children from a previous marriage and a modest amount of property. Three years after their mar-

---

[1] 183 Wash. 278, 48 P.2d 560 (1935).

riage, Thomas and Annette purchased a mobile home which they put on Annette's Arlington, Washington, property. In order to convert it to community property in 1982, Annette deeded a one-half community interest in the property to Thomas. The same year, Annette and Thomas executed a standard community property agreement which provided that "upon the death of either of us, title to all community property as herein defined shall immediately vest in fee simple in the survivor." The agreement also had a nonstandard clause:

> [A]fter both Thomas F. Wilkes and Annette L. Wilkes have deceased[,] the residuary estate shall go to our six children, listed as follows: George L. O'Bryan, Thomas B. Wilkes, Norman E. Wilkes, Danny E. O'Bryan, Kenneth B. Wilkes, Cynthia A. Hale. Each shall receive equal shares of said residuary estate. (1/6 each).

Two years later, Annette and Thomas executed identical wills which provided, as evidenced by Thomas's will:

> SECOND: I declare that I am now married to Annette L, Wilkes, who is my wife; I have four children: Thomas R. Wilkes, Norman E. Wilkes, Kenneth B. Wilkes and Cynthia Ann (Hale) Wilkes and two step-children: George L. O'Bryan and Danny E. O'Bryan, and no deceased children with lineal descendants now living.

> THIRD: I give, devise and bequeath all of my estate of whatever nature and wheresoever situate to my wife, Annette L. Wilkes. In the event that my wife shall not survive me or shall die within thirty days after my death, I give, devise and bequeath all of my estate to my above-named children and step-children, and to any children hereafter born to or adopted by me, and to the lineal descendants of those predeceasing me, in equal shares, per stirpes. . . .

> . . . .

> FIFTH: I declare that I have or may enter into an agreement concerning the status and disposition of community and separate property with my said wife. It is my intent that this Will shall not be revoked by said agreement, and that said

agreement shall not be revoked by this Will, but that in the event my said wife survives me and there is any of my property which is for any reason not effectively disposed of by said agreement, the provisions of this Will shall be effective as to such property.

Thomas died in 1993, but his will was never probated. Annette claimed title to the mobile home property under the community property agreement.

In March of 1996, Annette executed and delivered a revocable quit claim deed intended to convey the mobile home property to her son Danny O'Bryan after her death. On the same day, Annette executed a will which purported to "revoke all former wills and codicils previously made" and made no reference to the community property agreement. The will devised all property, aside from a few items of personal property, to O'Bryan. Annette died in 1996.

After O'Bryan took possession of the mobile home property, Thomas's three children filed a creditors' claim against him and Annette's estate, arguing that by the clear terms of the community property agreement, they were each entitled to one-sixth of Annette's personal property. When the claim was rejected, they filed a complaint and summary judgment motion against O'Bryan and Annette's estate to quiet title in each of them to an undivided one-sixth interest in the property.[2] Arguing that the community property agreement provided Annette with a fee simple interest in the mobile home property which she could devise as she pleased, O'Bryan filed a cross motion for summary judgment. The trial court granted O'Bryan's motion, and Thomas's children appeal.[3]

## DISCUSSION

■ A statutory community property agreement is a will

---

[2]In addition, they sought one-half of the rental value of the real estate for the period during which O'Bryan excluded them from the property.

[3]Both parties concede that there are no contested facts. This court reviews questions of law de novo. *Simpson Tacoma Kraft Co. v. Department of Ecology,* 119 Wn.2d 640, 835 P.2d 1030 (1992).

substitute which allows a husband and wife to contract for the automatic vesting at death of their community property in the survivor without court administration.

> Nothing contained in any of the provisions of this chapter or in any law of this state, shall prevent the husband and wife from jointly entering into any agreement concerning the status or disposition of the whole or any portion of the community property, then owned by them or afterwards to be acquired, to take effect upon the death of either. But such agreement may be made at any time by the husband and wife by the execution of an instrument in writing under their hands and seals, and to be witnessed, acknowledged and certified in the same manner as deeds to real estate are required to be, under the laws of the state, and the same may at any time thereafter be altered or amended in the same manner. . . .[4]

Several commentators have noted that, while it appears that the statutory community property agreement was originally intended to pass property from a predeceasing spouse to a surviving spouse on the death of the former, it is possible that they may also "be used as a will substitute to pass property to third parties on the death of either the first or the second spouse to die."[5] But before we can consider whether a community property agreement can be used that way, we must first decide (1) whether the Wilkes evinced a mutual intent to rescind their community property agreement in their 1984 wills, and if not, (2) whether their community property agreement was designed to provide their children with a vested interest in their residual community estate.

O'Bryan argues that the terms of the 1984 wills executed by Annette and Thomas should prevail over the earlier, inconsistent community property agreement. As previously noted, the 1982 community property agreement provided that upon the death of the first spouse, "title to all com-

---

[4]RCW 26.16.120 (footnote omitted).

[5]William Oltman & Mark Reutlinger, *The Statutory Community Property Agreement as a Will Substitute on the Death of the Second Spouse*, 19 GONZ. L. REV. 511, 518 (1983-84).

munity property as herein defined shall immediately vest in fee simple in the survivor," but that after both spouses have died, "the residuary estate shall go to our six children." In their identical 1984 wills, however, Thomas and Annette each devised "all of my estate of whatever nature and wheresoever situate" to the other. The wills did not mention a residuary estate, providing only that if Annette and Thomas were to die within 30 days of each other, the estate would be divided among their children. O'Bryan argues that because these wills devise their estates "each to each other, without qualification," Annette and Thomas intended to revoke their previous community property agreement.

■ In *Higgins v. Stafford*,[6] the Washington Supreme Court held that although "[m]utual intent to rescind a community property agreement must be demonstrated . . . [,] mutual acts having the effect of rescinding the agreement are sufficient."[7] In *Higgins*, the court found that because a later will "explicitly expressed"[8] that "it is the desire of both 'Wife' and 'Husband' "[9] to place a limitation on an earlier community property agreement, the couple had expressed a mutual intent to modify the earlier agreement. Here, in direct contrast, both of the 1984 wills specifically provided that:

> this Will shall not be revoked by said [community property] agreement, and that said agreement shall not be revoked by this Will, but that in the event my said [spouse] survives me and there is any of my property which is for any reason not effectively disposed of by said agreement, the provisions of this Will shall be effective as to such property.

Thus, the wills themselves established that they did not revoke the community property agreement. And as Tho-

---

[6] 123 Wn.2d 160, 866 P.2d 31 (1994).

[7] *Id.* at 168.

[8] *Id.* at 169.

[9] *Id.*

mas's children note, because the wills "only acted upon property *not* disposed of by the community property agreement," they were not necessarily inconsistent with the agreement. The conclusion that Annette and Thomas did not intend to rescind their agreement is further bolstered by the fact that after Thomas died, Annette claimed title to their community property under the agreement, not his will.

Because Annette and Thomas did not evince a clear intent to revoke their community property agreement, the agreement is controlling, and we must analyze its terms to determine the nature of the property interest Annette received when Thomas died. If, as the trial court found, Annette received a fee simple interest in the community property, then she was free to dispose of the property during her lifetime without limitation. But if, as Thomas's children argue, the agreement was designed to create a vested interest in the Wilkes' children, this court will have to determine whether a community property agreement can be used for that purpose.

In *Bartlett v. Bartlett*, the Washington Supreme Court addressed the precise issue presented here. The Bartletts were a husband and wife with children from previous marriages who executed a community property agreement which provided that upon the death of either spouse, their community property would "at once vest . . . *in fee simple.*"[10] Appended to this standard community property form was a handwritten provision stating that "any and all property in the possession of the survivor of the aforesaid parties shall, at the time of his or her death, be equally divided among the surviving children of said parties to this agreement, share and share alike."[11] As in this case, after the husband died, the wife, in contravention of the community property agreement, devised the remainder of her estate to her two children, leaving nothing to the children

---

[10]183 Wash. at 280.

[11]*Id.*

of her former husband. After quoting the community property statute, which is functionally identical to current community property law,[12] the *Bartlett* court noted that the parties "intended to avail themselves of the privilege conferred by the statute and, except for the concluding paragraph of the agreement, they meticulously followed the statutory requirements. The purpose was, and the agreement specifically so states, that, upon the death of either, the entire community property should vest in the other *in fee simple*."[13] After restating the basic principle that a fee simple estate is "the highest estate known to the law,"[14] the court determined that because the parties had granted a fee simple estate to the surviving spouse, they could not then restrict the "grantee's power of alienation:"[15]

> In this case, the parties having clearly expressed and effected their purpose to vest title in fee simple to the survivor of them, neither of them could, by a subsequent provision in the instrument, restrict the right of alienation by the other. Viewed in one light, the concluding provision of the agreement itself confirms the intention of each of the parties to vest a fee-simple estate in the other. When they provided that "all property in possession of the survivor" should, at his or her death, be equally divided among their surviving children, each thereby recognized the *jus disponendi* of the other. Indeed, the rights of the children are predicated upon the condition that the property has not been previously disposed of by the survivor. The parties having availed themselves of the right conferred by statute to vest title in fee simple upon the death of *either* of them, they could not subvert the purpose and effect of their agreement by suspending the vesting of title to a

---

[12]As Justice Brachtenbach notes in his article entitled, *The Community Property Agreement Revisited*, 29 GONZ. L. REV. 11 (1993-94), this statute was enacted in 1879 and remains in its original language except for a few necessary terminology alterations.

[13]*Bartlett*, 183 Wash. at 282.

[14]*Id.*

[15]*Id.* at 283.

part or all of the property until after the death of *both* of them.[16]

Because the facts in *Bartlett* are the same as the facts here, if *Bartlett* has not been overruled or altered by a later decision or legislative enactment, it is dispositive. Thomas's children recognize that, if *Bartlett* applies, they cannot prevail. They contend that *Bartlett* "was overruled by *Dunn* and by RCW 11.02.090." But RCW 11.02.090 was repealed in 1993, and Thomas's children do not explain how its replacement—RCW 11.02.091—would affect the Wilkes' agreement. The question then is whether *Bartlett* was overruled by *In re Estate of Dunn*.[17]

In that case, the Dunns signed "an instrument, in writing, in the nature of a community property agreement"[18] which stated that it was also intended to serve as their "Last Will and Testament." The agreement provided that "[u]pon the death of either of us the survivor shall have all of said property before named to use, own, enjoy, sell, lease or encumber and dispose of, during his or her life as the case may be, and upon the death of the survivor of us the unused and undisposed of portion of such property only shall go to the Trustee hereinafter named . . . ."[19] In order to calculate the inheritance tax on this property after the wife's death, the court had to determine what estate her husband received upon her death. After noting that, "by its express terms," the instrument was both a contract and a will, the court construed it "according to the rules applicable to mutual wills"[20] and held that the instrument left the husband a life estate in his wife's share of the community property, with a vested remainder in the property to their children after the husband's death.

---

[16]*Id.* at 283.

[17]31 Wn.2d 512, 197 P.2d 606 (1948).

[18]*Id.* at 513.

[19]*Id.* at 514.

[20]*Id.* at 526.

Thomas's children cite *Dunn* as the primary support for their contention that Thomas and Annette could, and did, provide for a similar disposition in their community property agreement. *Dunn* does not support their argument for two reasons. First, this case did not "overrule" *Bartlett*. All the *Dunn* court said about *Bartlett* was that their "agreement was not offered for probate as Mr. Bartlett's will, and, even if otherwise sufficient to constitute his will, could not have been admitted to probate as such, having been attested by only one witness."[21] This observation supports the conclusion that the *Dunn* court treated the Dunns' community property agreement as a will, thus distinguishing it from the Bartlett agreement.[22]

Second, and most significantly, the instrument in *Dunn* devised the community property to the surviving spouse "during his or her life as the case may be." This language differs markedly from the Wilkes' agreement, which states that upon the death of either spouse, "title to all community property as herein defined shall immediately vest in fee simple in the survivor." Although Thomas's children set out side by side the relevant clauses from the *Dunn* and Wilkes' agreements in their brief, they fail to acknowledge that a conveyance of property to be used "during his or her life," even if combined with language allowing the surviving spouse to "sell" or "encumber" the property, is not the same as a clear grant of a "fee simple" interest. The Dunn agreement did not permit the survivor to "devise" the property, and this is the critical difference between *Dunn* and *Bartlett*. The holder of a fee simple interest may devise property to pass upon his or her death, whereas the holder of a life estate, even with unlimited inter vivos power over

---

[21]*Id.* at 523.

[22]*See* William Oltman & Mark Reutlinger, *The Statutory Community Property Agreement as a Will Substitute on the Death of the Second Spouse,* 19 Gonz. L. Rev. 511, 516 (1983-84) (In *Dunn,* "the agreement operated to give the surviving husband a life estate in the property passing from the wife, with the remainder of her interest apparently passing to their children at the time of the wife's death; but . . . since the agreement was probated, it is most plausible that the court was treating it as passing under the will.")

the estate, may not.[23] We must therefore reject Thomas's children's argument that the language used in *Dunn* has the same legal significance as a fee simple interest.

■ We also reject their argument that the community property agreement was a contract that bound Annette to devise the residuary property equally among the six children.[24] Just simply because the agreement contains a disposition scheme for a residuary estate does not mean that the parties promised to ensure that a residuary estate in fact existed at the survivor's death. When interpreted in its entirety, the contract demonstrates that Thomas and Annette intended that a fee simple estate would vest in the surviving spouse, and that if the surviving spouse had not used, sold, devised, or encumbered the property at the time of his or her death, the residuary estate would be divided equally among their six children. Because Annette chose to devise the community property to her son, there was no residuary estate left to pass under the residuary provision of the agreement.

*Bartlett* clearly directs that when a community property agreement gives a fee simple grant of the community estate to the surviving spouse, any further attempt to grant remainders in third parties upon the death of both spouses is a nullity. We recognize that in the 65 years since *Bartlett* was decided, an increase in dissolutions, divorces, and melded families has brought a greater urgency to the question of whether community property agreements may provide for third persons upon the death of the surviving spouse. In this decision we expressly do not resolve that issue. Rather, we recognize that *Bartlett* continues to control under the facts of this case.

---

[23]In *In re Estate of Taylor*, 32 Wn. App. 199, 201, 646 P.2d 776 (1982), the court recognized that dispositions such as the one in *Dunn* which give the surviving spouse "almost total control" have been characterized as "life estates coupled with unlimited inter vivos powers of disposition over the estate res." *See In re Estate of Gochnour*, 192 Wash. 92, 72 P.2d 1027 (1937).

[24]Community property agreements are contracts, and we must give effect to the clearly expressed intent of the parties. *In re Estates of Wahl*, 99 Wn.2d 828, 664 P.2d 1250 (1983).

Affirmed.

BAKER and APPELWICK, JJ., concur.

Review denied at 140 Wn.2d 1027 (2000).